[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-10028
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 3, 2011
JOHN LEY
CLERK

D.C. Docket No. 1:10-cv-01181-CAP

HEALTHPRIME, INC.,
HP/HOLDINGS, INC.,

Plaintiffs - Appellants,

versus

SMITH/PACKETT/MED/COM, LLC,
SMITH-MOORE COMPANY, L.C.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 3, 2011)

Before BARKETT, HULL and MARCUS, Circuit Judges.

PER CURIAM:

In this diversity jurisdiction case, Plaintiffs HealthPrime, Inc. and

HP/Holdings, Inc. appeal the district court's dismissal of their First Amended Complaint. The district court concluded that the Georgia statutes of limitations had run on Plaintiffs' claims for breach of contract, conversion, misappropriation of corporate funds, and fraud. After review, we affirm.

## I. BACKGROUND

On March 15, 2010, Plaintiffs HealthPrime and HP/Holdings filed suit against Defendants Smith/Packett Med-Com, LLC ("Smith/Packett") and Smith-Moore Company, L.C. ("Smith-Moore"), alleging four claims under Georgia law in relation to certain sales proceeds: (1) misappropriation, (2) conversion, (3) fraud, and (4) breach of contract.[1] Plaintiffs later filed a First Amended Complaint containing the same four claims. We recount the allegations in the First Amended Complaint.

### A. First Amended Complaint

HP/North Carolina IV, Inc. ("HPNC") is a North Carolina corporation with two shareholders: (1) Plaintiff HealthPrime, a 50% shareholder, and (2) Defendant Smith-Moore, also a 50% shareholder.

Plaintiffs HealthPrime and HP/Holdings are Georgia corporations. Douglas

---

[1]Plaintiffs initially filed this case in state court, and Defendants later removed the case to federal court under diversity jurisdiction. See 28 U.S.C. §§ 1332, 1441.

Mittleider is the CEO of both HealthPrime and HP/Holdings.

Defendants Smith-Moore and Smith/Packett are Virginia limited liability companies. James R. Smith is the Vice President of HPNC and a "Member" of Smith/Packett.

HPNC and its two shareholders (Plaintiff HealthPrime and Defendant Smith-Moore) owned a piece of real estate property known as the "Carthage Facility." In the fall of 2005, HPNC, through Defendants Smith/Packett and Smith/Moore,[2] sold the Carthage Facility.

"Prior to the sale of the property, Douglas Mittleider, on behalf of HealthPrime, Inc., and James R. Smith, on behalf of Smith-Moore, met in Atlanta, Georgia on May 11, 2005 to discuss time lines and parameters of the sale of the Carthage Property. During the meeting, Douglas Mittleider and James R. Smith agreed that when the property was sold, the proceeds from the sale would be distributed proportionally to the shareholders of [HPNC]."

According to Plaintiffs, "Defendants intentionally induced Plaintiffs to agree to the sale of the Carthage Facility by assuring Plaintiffs that the sale proceeds would be distributed equally among [HPNC]'s two shareholders," when in fact "Defendants always intended to use the sale proceeds for their own

---

[2]It is unclear exactly what role Smith/Packett played in the sale of the Carthage Facility.

purposes and did not ever intend to fully compensate the Plaintiffs for their share of the sale proceeds through a corporate distribution, as agreed prior to the sale of the Carthage Facility and confirmed during the May 11, 2005 meeting in Atlanta."

Plaintiffs allege that once the sale of the Carthage Facility occurred, rather than disbursing the cash proceeds from the sale of the Carthage Facility property proportionally to HPNC's two shareholders (Plaintiff HealthPrime and Defendant Smith-Moore), Defendants deliberately allocated some of the sales proceeds to cover the alleged debts of Plaintiffs' entity Cross City in other unrelated business transactions.  Plaintiffs allege that they "did not consent to the use of the sale proceeds for any other purpose than a pure shareholder distribution between [HPNC]'s two shareholders."

Plaintiffs allege that: (1) they are owed at least $503,250.00 from the sale of the Carthage Facility property; (2) Defendants misappropriated corporate funds and breached their shareholders' agreement with Plaintiffs by refusing to distribute the sales proceeds "proportionally to [HPNC]'s shareholders, as agreed prior to the sale of the Carthage Facility property"; and (3) Plaintiffs demanded their monies but "Defendants have refused to hand over the proportional amounts."

Plaintiffs also alleged that "Defendants committed the acts of breach of

contract, misappropriation of funds, fraud, and conversion during [the] May 11, 2005 meeting" in Georgia.

**B.     Defendants' Motions to Dismiss**

Defendants Smith/Packett and Smith-Moore filed separate motions to dismiss the First Amended Complaint under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3), arguing, <u>inter alia</u>, that the statute of limitations had run on Plaintiffs' claims.[3]

Both Defendants attached exhibits to their motions to dismiss. Defendants attached the "Supplemental Affidavit of James R. Smith,"[4] in which Smith stated that he met with Mittleider on May 11, 2005, and that "[t]he discussion of the Carthage Property [during that meeting] was a very preliminary discussion, and there was no mention of how any proceeds from any sale would be shared."

One of the exhibits to Smith's affidavit is a November 3, 2005 letter from Plaintiffs' Mittleider to Defendants' Smith, directing Defendants not to disburse

---

[3]Rule 12(b)(2) provides that a party may assert, by motion, a defense of lack of personal jurisdiction. Rule 12(b)(3) provides that a party may assert, by motion, a defense of improper venue. However, both the district court in its order, and the parties in their briefs on appeal, refer to Defendants' motions as motions under Rule 12(b)(6) for failure to state a claim, and we therefore treat them as such.

[4]Smith's original affidavit was filed as an exhibit to Smith-Packett's motion to dismiss the original complaint, which was dismissed as moot when Plaintiffs were granted leave to file the First Amended Complaint.

HealthPrime's share of the sales proceeds to any entity other than HealthPrime:

> Dear Jim:
>
> I have been advised by your office that you are contemplating distributing some of the Carthage proceeds to Cross City for some of its obligations.
>
> Please be advised that you do not have my permission to allocate any of HealthPrimes's proceeds from the sale of the Carthage facility to any entity other tha[n] HealthPrime (1/2 of the net proceeds of the sale). There is not a commonality of interest in the ownership of the two projects, and it would be a fiduciary breach for either of us to allow the proceeds of the sale of the Carthage facility to be used in any fashion other than distributing 1/2 of the proceeds to each shareholder. Based on the e-mail received from Bruce McKibbon late yesterday there appeared to be several avenues to solve Charlie's cash crunch. I would not be adverse to [HPNC] loaning him sufficient proceeds to cover his immediate payroll shortfall (presuming that it is $50,000 or less).
>
> I would appreciate your acknowledging that you will not utilize any of the proceeds from the Carthage sale for any purpose other than a stockholder distribution, except for the small loan mentioned above. I will give you a call to confirm.
>
> Sincerely,
>
> Douglas K. Mittleider, President

Also attached as an exhibit to Smith's affidavit was a December 30, 2005 letter from Plaintiffs' Mittleider to Michael Meeks of Smith/Packett, objecting to how Defendants proposed to disburse the Carthage Facility sales proceeds:

> Dear Michael:

6

I have received your checks dated December 28, 2005 in the amounts of:

- $260,000 - Check # 1434 payable to Doug Mittleider
- $120,000 - Check # 1435 payable to Health Prime
- $75,000 - Check # 1436 payable to Health Prime
- $120,000 - Check # 1443 payable to Health Prime

As you know, we disagree with the distribution amounts, and continue to believe that the amounts should be substantially higher. Accordingly, while we will deposit these monies, we waive no rights to seek full payment of any and all monies due to Health Prime, Inc. and will insist on full payment of those monies as set forth in my letter to Jim Smith of December 22, 2005 (as corrected). Please advise at your earliest convenience if you disagree with my characterization.

Sincerely,

Douglas K. Mittleider
President

In their response to Defendants' motions, Plaintiffs attached the affidavit of Douglas K. Mittleider, the CEO of HealthPrime and HP/Holdings. Among the exhibits to Mittleider's affidavit is a March 15, 2006 memo to Plaintiffs' Mittleider from Michael Meeks at Defendant Smith/Packett, notifying Mittleider that a final payment and accounting of the sales proceeds are attached:

Mr. Mittleider,

I am enclosing a check for $33,732.49 from [HPNC] along with an attached final accounting of funds.

Should you have questions, please feel free to call.

7

Thank you.

Attached to the memo is a spreadsheet showing HPNC's cash on hand, checks cut on March 10, 2006, and expenses yet to pay.

## C.    District Court's Order

The district court granted Defendants' motions to dismiss, concluding that the four-year statutes of limitations had run on all of Plaintiffs' claims. The district court concluded that HealthPrime knew or should have known of the alleged injury no later than December 30, 2005, when HealthPrime's Mittleider sent his letter acknowledging receipt of certain funds from the sale of the Carthage Facility property but claiming more was owed. The district court rejected Plaintiffs' argument that the "confidential and trusting relationship" between Mittleider and Smith delayed the statute of limitations, noting that Plaintiffs and Defendants are sophisticated business entities transacting business and that the November and December 2005 letters written by Mittleider indicated an awareness of how the proceeds from the property sale were to be distributed.

Plaintiffs appeal the district court's dismissal of their claims for conversion, misappropriation of corporate funds, and fraud.[5]

---

[5]On appeal, Plaintiffs have made no argument regarding their breach of contract claim, and thus, that claim is deemed abandoned. See United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) (party abandons an issue if not raised in initial brief).

8

## II.  STANDARD OF REVIEW

We review <u>de novo</u> a district court's dismissal of a complaint under Rule 12(b)(6) for failure to state a claim.  <u>Speaker v. U.S. Dep't of Health and Human Servs. Ctrs. For Disease Control and Prevention</u>, 623 F.3d 1371, 1379 (11th Cir. 2010).  We accept the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff.  <u>Id.</u>  Moreover, we review a district court's application of the statute of limitations <u>de novo</u>, "according deference in a diversity case to a district court's interpretation of the law of the state in which it sits."  <u>Therrell v. Ga. Marble Holdings Corp.</u>, 960 F.2d 1555, 1561 (11th Cir. 1992).

## III.  DISCUSSION

### A.  Statute of Limitations for Conversion and Misappropriation[6]

Plaintiffs argue that there was no conversion under Georgia law until they made a demand for the return of their property and Defendants refused to return the property.  Thus, they claim that the statute of limitations began to run only on

---

No party challenges the authenticity or the district court's consideration of the November and December 2005 letters.

[6]Plaintiffs' brief on appeal treats their claims for conversion and misappropriation of funds as the same for the purposes of the statute of frauds analysis, as misappropriation of funds is one species of conversion and both torts are governed by the same statute of limitations.  <u>See</u> O.C.G.A. § 9-3-32.  Therefore, our analysis of conversion applies also to Plaintiffs' claim for misappropriation of funds.

9

March 15, 2006, when Defendants refused to comply with their demand for additional funds.

Conversion is defined in Georgia as "an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." Tidwell v. Tidwell, 251 Ga. App. 863, 864, 554 S.E.2d 822, 824 (2001) (citations omitted). A plaintiff establishes a cause of action for conversion by showing "(1) title to the property or the right of possession, (2) actual possession in the other party, (3) demand for return of the property, and (4) refusal by the other party to return the property." Johnson v. First Union Nat'l Bank, 255 Ga. App. 819, 823, 567 S.E.2d 44, 48 (2002).

Under Georgia law, "Actions for the recovery of personal property, or for damages for the conversion or destruction of the same, shall be brought within four years after the right of action accrues." O.C.G.A. § 9-3-32. "As a general rule, a right of action for wrongful conversion accrues on the date of the conversion." Logan v. Tucker, 224 Ga. App. 404, 406, 480 S.E.2d 860, 862 (1997); see Therrell, 960 F.2d at 1560 ("In a conversion action, the cause of action accrues on the date of the conversion." (citing Harper v. Jones, 103 Ga. App. 40,

10

41, 118 S.E.2d 279, 280 (1961))).

"The true test to determine when a cause of action accrues is to ascertain the time when the plaintiff could first have maintained her action to a successful result." Travis Pruitt & Assocs., P.C. v. Bowling, 238 Ga. App. 225, 226, 518 S.E.2d 453, 454 (1999); Wood v. Garner, 156 Ga. App. 351, 352, 274 S.E.3d 737, 738 (1980) (in a case where plaintiff surrendered possession voluntarily for an indefinite time, "[t]he statute began to run from the date of demand and refusal"); Harper, 103 Ga. App. at 41, 118 S.E.2d at 280 (holding, in a conversion case for timber cut and removed from plaintiff's land, that "right of action accrued in 1951 when the timber was cut and removed").

"Mere ignorance of the facts constituting a cause of action does not prevent the running of the statute of limitations, for a plaintiff must exercise reasonable diligence to learn of the existence of a cause of action." Macomber v. First Union Nat'l Bank of Ga., 212 Ga. App. 57, 59, 441 S.E.2d 276, 278-79 (1994) (quotation marks omitted); see id. (holding that causes of action for fraud and conversion against bank began running when plaintiff was given the files for his loan account and should have known that credits were not being made to the account).

We conclude that the district court did not err in concluding that the four-year statute of limitations on Plaintiffs' conversion and misappropriation claims

11

began to run no later than December 30, 2005, and that those claims were time-barred when Plaintiffs filed this case on March 15, 2010. As an initial matter, we note that Plaintiffs' First Amended Complaint alleges that "Defendants committed the acts of breach of contract, misappropriation of funds, fraud, and conversion during a May 11, 2005 meeting within DeKalb County, Georgia." On its face, therefore, the First Amended Complaint's allegations and claims of conversion and misappropriation are time-barred.

Second, even absent this allegation in the First Amended Complaint, the exhibits attached to Defendants' motion to dismiss show that Plaintiffs' Mittleider made a demand on November 3, 2005 that all of HealthPrime's share of the proceeds from the sale be distributed to HealthPrime, rather than be credited to other debts. Mittleider's December 30, 2005 letter shows that this demand was refused and that Defendants had paid Plaintiffs less than the distribution to which they felt they were entitled. We agree with the district court that under these circumstances, Plaintiffs' right of action for conversion and misappropriation accrued no later than December 30, 2005, and that their claims for conversion and misappropriation were therefore time barred as of December 30, 2009.

**B.     Statute of Limitations for Fraud**

Plaintiffs argue that the district court erred in dismissing their claim of fraud

because the existence of a "confidential relationship" under Georgia law tolled the statute of limitations until they discovered the fraud.[7]  See O.C.G.A. § 23-2-58 ("Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.").  Because they did not discover Defendants' fraudulent acts until March 15, 2006, Plaintiffs argue, the statute of limitations on their fraud claims did not begin to run until that date.

Under Georgia law, "If the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud."  O.C.G.A. § 9-3-96.  The Georgia Supreme Court has held that only actual fraud can toll the statute of limitations.  Shipman v. Horizon Corp., 245 Ga. 808, 808, 267 S.E.2d 244, 246 (1980).  "[W]here . . . actual fraud is the gravamen of the action[,] . . . [T]he statute of limitations is

_____

[7]Under Georgia law, the statute of limitations for claims of fraud is four years.  See O.C.G.A. § 9-3-31.

13

tolled until the fraud is discovered or by reasonable diligence should have been discovered." Id. "Failure to exercise reasonable diligence to discover the fraud may be excused where a relationship of trust and confidence exists between the parties." Id. at 808-09, 267 S.E.2d at 246.

Even assuming, as Plaintiffs argue, that a confidential relationship existed between the parties in this case, it would not toll the statute of limitations on Plaintiffs' claims under Georgia law, because Plaintiffs were already aware as of at least November 2005 that Defendants did not plan to distribute the proceeds of the sale of the Carthage Facility equally to Plaintiffs and Defendants, but instead planned to apply them to the pre-existing debts of one of Plaintiffs' entities (Cross City). In his November 2005 letter, Plaintiffs' Mittleider expressed his disagreement with Defendants' intended distribution plan, and stated that he would call Smith to confirm the proper distribution of funds. Given Plaintiffs' awareness of the fact, in November 2005, that Defendants were distributing less proceeds to Plaintiffs than Plaintiffs felt they were entitled to receive, they cannot invoke their relationship with Defendants to toll the statute of limitations, as they did not exercise reasonable diligence in discovering the fraud.

For all of these reasons, we conclude that Plaintiffs' claims for conversion, misappropriation of funds, and fraud are barred by the statute of limitations, and

14

the district court properly dismissed the First Amended Complaint.

**AFFIRMED.**