[Cite as *N. Side Bank & Trust Co. v. Trinity Aviation, L.L.C.*, 2020-Ohio-1470.]

# IN THE COURT OF APPEALS

# FIRST APPELLATE DISTRICT OF OHIO

# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| NORTH SIDE BANK & TRUST COMPANY, | : | APPEAL NOS. C-190021 |
| | | C-190023 |
| | : | TRIAL NO. A-1205557 |
| Plaintiff-Appellee/Cross-Appellant, | : | *O P I N I O N.* |
| vs. | : | |
| TRINITY AVIATION, LLC, et al., | : | |
| Defendants, | : | |
| and | : | |
| ARLINGTON HEIGHTS RECYCLING, LLC, d.b.a. A&A RECYCLING, | : | |
| | : | |
| Intervenor-Defendant-Appellant/Cross-Appellee, | : | |
| and | : | |
| HOLLAND ROOFING GROUP, LLC, | : | |
| and | : | |
| INDUSPRO, LLC, | : | |
| Third-Party Defendants-Appellants/Cross-Appellees. | : | |

Civil Appeals From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Vacated in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal:  April 15, 2020

*Markesbury & Richardson Co., LPA,* and  *Barry A. Rudell, II,*  for  Plaintiff-Appellee/Cross-Appellant,

*Statman, Harris & Eyrich, LLC, William B. Fecher, Alan J. Statman*  and *Saba N. Alam,* for Intervenor-Defendant-Appellant/Cross-Appellee      and      Third-Party      Defendants-Appellants/Cross-Appellees.

**BERGERON, Judge.**

{¶1}    In this high-flying dispute over airplane parts, replete with a failing company, shenanigans with a warehouse full of inventory, and a tortured procedural history, we confront a fairly basic question that vexes first-year law students: did the parties form a contract?  Although these sophisticated parties certainly knew how to dress up a contract in more formal attire, here they just sent a few email volleys.  This correspondence, however, contained the necessary attributes for contract formation, and we accordingly reverse the trial court's conclusion to the contrary and remand for further proceedings.

I.

{¶2}    The origins of this appeal stretch back a decade with the plaintiff-appellee/ cross-appellant North Side Bank & Trust Company ("NSBT") and one of its debtors, Trinity Aviation, LLC, ("Trinity").  After securing a loan with NSBT, Trinity subsequently defaulted.  NSBT initially worked with Trinity to bring it into compliance with the loan agreement, but this proved fruitless, ultimately prompting NSBT to file a complaint in July 2012 in the Hamilton County Common Pleas Court, citing default under the loan agreement and accelerating the remaining sums due.  NSBT obtained judgment in its favor based on executed cognovit provisions in the loan instruments against Trinity and its personal guarantors, Gary and Debbie Post and Charles and Lynn Young, for the remaining balance on the loan.  Of course, as in so many of these types of disputes, that judgment is merely the prelude for further proceedings rather than the finale.

{¶3}    Leading up to the July 2012 judgment, NSBT also worked to liquidate assets that Trinity pledged as collateral for the loan and contracted with a liquidator out of Texas, Transportation Planning, Inc., ("TPI") to handle the logistics of a sale of assets, which

involved a significant amount of airplane parts. The materials in question were located at a warehouse on Kemper Road leased by Trinity, later known as (perhaps unlucky) "Building 13." Building 13 also housed consignment inventory belonging to another entity, which was separated from Trinity's assets and enclosed in a small room within the warehouse.

{¶4} For various reasons, TPI's initial efforts to liquidate the parts failed to yield suitable results, as the bank received no legitimate offers. Consequently, TPI advised NSBT that an alternative sale of the materials as scrap might prove viable as a means of recouping some of its losses. As part of this new plan to liquidate the items as scrap, TPI contacted various entities that might be interested in purchasing scrap metals, including Arlington Heights Recycling, LLC, d.b.a. A&A Recycling ("A&A Recycling").

{¶5} Following that outreach, Douglas Blair, the owner and operator of A&A Recycling, visited and viewed material located at Trinity's Building 13 with Sam Ashmore of TPI in June 2012. Mr. Blair and Mr. Ashmore toured the building, with Mr. Blair examining the metals contained in the inventory. After completing this assessment, Mr. Blair subsequently emailed Mr. Ashmore a price-per-pound "bid" for the metals located at Building 13 on June 21, 2012, the "Phase I" purchase. Mr. Ashmore confirmed that A&A Recycling prevailed on the bid, authorizing A&A Recycling to remove the Phase I materials from Building 13. Given the volume of parts, Mr. Blair explained that this exercise took "a couple of trucks and * * * about five days to remove phase one," which they relocated to A&A Recycling's place of business.

{¶6} After the Phase I purchase, Mr. Ashmore again contacted A&A Recycling about purchasing more material located in Building 13, the so-called "Phase II" purchase. Mr. Blair explained that he initially viewed this additional material on July 2, 2012, but

4

returned to the warehouse on July 9. During this second visit, the parties realized that Trinity's principal, Gary Post, had moved items within the warehouse and relocated other items from Building 13 (presumably in an effort to hide more valuable collateral from NSBT). Despite recognizing that many "high-end parts" were no longer in the warehouse, Mr. Blair submitted a second bid via email on July 13. This email confirmed the per-pound prices for both the Phase I and Phase II bids, stipulated to the removal of the Phase II materials, and referenced a $20,000 deposit, with the remaining sums due to be paid by August 1 after weighing the materials. He also sent a second email July 13 asking for written confirmation of the bank's acceptance of both bids. Mr. Ashmore wasted little time in agreeing to this—the next day, he wrote "[t]his is to advise that the terms and conditions of your bid to purchase material from Trinity Aviation warehouse is accepted by North Side Bank[.]"

{¶7} A&A Recycling then enlisted the Holland Roofing Group, LLC, ("HRG") (owned by an individual named Hans Philippo) to assist it in removing the Phase II materials. In light of the volume, this effort necessitated over 50 tractor-trailers to move the parts. With HRG's help, A&A Recycling transported all of the material to a warehouse in Kentucky owned by a company called Induspro, LLC, ("Induspro"). The Phase I materials were also eventually relocated to this warehouse as well.

{¶8} As NSBT struggled to get its arms around the extent of Trinity's inventory (and its collateral), it eventually realized that assets were located at several different warehouses and potentially commingled with consignment inventory belonging to other entities. Therefore, days after giving A&A Recycling the green light to proceed with removal of the Phase II inventory, NSBT moved for appointment of a receiver "for the purpose of

carrying into effect the judgement of [NSBT], and collecting, preserving, accounting for, and determining the claims of all parties to the personal property of * * * Trinity Aviation, LLC." The court ultimately approved this motion, appointing Richard Nelson receiver to "take possession of, assemble, account for and marshal all property of Trinity Aviation, LLC."

{¶9} Understandably flummoxed by this turn of events, and concerned that the appointment of a receiver would stall the liquidation of the Phase I and Phase II materials now located in Kentucky, A&A Recycling asked the trial court in late 2012 to approve the sale and distribution of the assets in its possession. For its part, the bank opposed the sale, arguing that (1) A&A Recycling was not yet a party to the ongoing action between the bank and its debtor, (2) any sale of the assets was premature until the receiver could fully inventory the extent of the assets, and (3) "it [was] questionable whether A&A [Recycling] has a contractual right to purchase these assets for scrap[.]"

{¶10} Then, in July 2013, the receiver filed a motion requesting that the court approve a proposed online auction process to sell all the personal and consigned property of Trinity. At this time, A&A Recycling again objected, asserting that a sale of the assets already occurred, and it moved to intervene (which the court granted). For their part, the receiver and NSBT, citing the comingling of assets with consignment materials, the removal of items from the warehouse, and alleged lack of consensus on subject or quantity terms, maintained that the sale could not be enforced as there was no "meeting of the minds." In short, the bank took various inconsistent positions during these proceedings (a vice that A&A Recycling is guilty of as well) based on its vacillating view of the value of the parts. When it viewed them as relatively worthless, it was happy to send them to A&A Recycling

for scrap, but when the receiver offered a rosier view of the value, the bank concluded that no bargain was struck.

{¶11} The trial court eventually convened an evidentiary hearing to determine the propriety of the proposed receiver's sale and the contentious ownership issues, but ultimately threw up its hands in frustration as to the lack of consensus of what A&A Recycling had allegedly purchased, citing the general distribution of the materials over various locations and perceived lack of "meeting of the minds * * * as to what was being purchased for the $20,000." The court then granted the receiver's motion to sell the property, concluding that A&A Recycling failed to establish the requirements of a valid contract with NSBT.

{¶12} After an unsuccessful appeal of the decision by A&A Recycling (which we dismissed for lack of a final appealable order), the trial court eventually granted A&A Recycling leave to file various cross-claims, counterclaims and third-party claims against NSBT, the receiver, and TPI. In particular (in light of the failure of its contractual claim), A&A Recycling pursued unjust enrichment against NSBT for the moving and storage expenses related to the transport of the materials initially located at Building 13. While the trial on these matters began in November 2015, it was delayed while A&A Recycling moved to amend its claim and to add parties, which the trial court granted in 2016. The amended complaint now included A&A Recycling and the other parties involved in the removal and storage of the Phase II materials, including (among others) HRG and Induspro (collectively, the "A&A Parties").

{¶13} The trial finally progressed and drew to a close in late 2017, resulting in a 2018 letter decision and entry awarding the A&A Parties monetary damages against NSBT

on their unjust enrichment claim. From this judgment, the A&A Parties now appeal in two assignments of error, contesting the trial court's 2013 finding that no contract for sale existed for the Phase I and Phase II materials and challenging the award of damages on the unjust enrichment claim as erroneous for its exclusion of certain expenses. For its part, NSBT cross-appealed, asserting in a single assignment of error that the trial court erred in awarding unjust enrichment damages against it.

## II.

## A.

{¶14} In the first assignment of error, the A&A Parties assert that the trial court erred by declining to enforce the alleged sale between NSBT and A&A Recycling, finding that no "meeting of the minds" occurred. This implicates fundamental aspects of Ohio contract law. "Ohio recognizes three types of contracts: express, implied in fact, and implied in law (or quasi-contract)." *Linder v. Am. Natl. Ins. Co.*, 155 Ohio App.3d 30, 2003-Ohio-5394, 798 N.E.2d 1190, ¶ 18 (1st Dist.), citing *Legros v. Tarr*, 44 Ohio St.3d 1, 6, 540 N.E.2d 257 (1989). Express contracts exist when there is offer, acceptance, and mutual assent. *Id.* Implied-in-fact contracts require a showing of assent, but a court otherwise construes surrounding facts and circumstances to determine the scope of the agreement. *Id.* Finally, implied-in-law contracts are legal fictions which operate in equity when one party wrongfully receives a benefit giving rise to a legal obligation, i.e., claims for unjust enrichment and quantum meruit. *See id.*

{¶15} Thus, for either express or implied-in-fact contracts to exist, a meeting of the minds between the contracting parties must occur, demonstrated by offer, acceptance, and consideration. *See Reedy v. Cincinnati Bengals, Inc.*, 143 Ohio App.3d 516, 521, 758 N.E.2d

8

678 (1st Dist.2001) ("In order for a valid contract to exist, there must be a 'meeting of the minds' on the essential terms of the agreement, which is usually demonstrated by an offer and acceptance, and consideration."); *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 16 ("Essential elements of a contract include an offer, acceptance, contractual capacity, consideration * * *, a manifestation of mutual assent and legality of object and of consideration."). The alleged contract must also reflect the "essential terms," with requisite definiteness and certainty. *See Reedy* at 521 ("[T]he essential terms of the contract, usually contained in the offer, must be definite and certain."). The essential terms of a contract generally include the subject matter, identity of the parties bound, consideration, price, and quantity. *See Alligood v. Procter & Gamble Co.*, 72 Ohio App.3d 309, 311, 594 N.E.2d 668 (1st Dist.1991); *Knoop v. Orthopaedic Consultants of Cincinnati, Inc.*, 12th Dist. Clermont No. CA2007-10-101, 2008-Ohio-3892, ¶ 13 ("The essential terms of a contract include: the identity of the parties, the subject matter, consideration, a quantity term, and a price term.").

{¶16} Additionally, because this dispute involves a sale of goods over $500, the statute of frauds compels written memorialization of the agreement. *See* R.C. 1302.04; *Battle Axe Constr. L.L.C. v. H. Hafner & Sons, Inc.*, 1st Dist. Hamilton No. C-180640, 2019-Ohio-4191, ¶ 16-17 (emails between parties sufficed to form enforceable written agreement). Of course, we may construe multiple writings together to determine the scope of the parties' agreement. *See L.B. Trucking Co., Inc. v. C.J. Mahan Const. Co.*, 10th Dist. Franklin No. 01AP-1240, 2002-Ohio-4394, ¶ 26, quoting *Juhasz v. Costanzo*, 144 Ohio App.3d 756, 762, 761 N.E.2d 679 (7th Dist.2001) (" 'In order to prove the existence of a written contract, the essential elements of the contract must be part of a writing, or part of multiple writings that

9

are part of the same contractual transaction.' "); *Spectrum Benefit Options, Inc. v. Med. Mut. of Ohio*, 174 Ohio App.3d 29, 2007-Ohio-5562, 880 N.E.2d 926, ¶ 28 (4th Dist.) (same).

{¶17} Finally, we determine the existence of a contract as a question of law, and our standard of review on questions of law is de novo. *See R & A Lawn Care, LLC v. Back*, 1st Dist. Hamilton No. C-160682, 2017-Ohio-4404, ¶ 15; *Oryann, Ltd. v. SL & MB, L.L.C.*, 11th Dist. Lake No. 2014-L-119, 2015-Ohio-5461, ¶ 24 ("The existence of a contract is a question of law that we review de novo."); *Zelina v. Hillyer,* 165 Ohio App.3d 255, 2005-Ohio-5803, 846 N.E.2d 68, ¶ 12 (9th Dist.) (same).

B.

{¶18} With that background in mind, we turn our attention to the written record created by the parties—in this case a series of emails. We evaluate them to ascertain whether they "connote[ ] an exchange of promises where the parties have communicated in some manner the terms to which they agree to be bound." *Cuyahoga Cty. Hosp. v. Price*, 64 Ohio App.3d 410, 415, 581 N.E.2d 1125 (8th Dist.1989); *see Technical Const. Specialties v. Gerspacher,* 9th Dist. Medina No. C.A. 2785-M, 1999 WL 247297, *1 (Apr. 28, 1999), citing *Legros,* 44 Ohio St.3d at 6, 540 N.E.2d 257 (noting that a meeting of the minds indicates that the parties have a distinct and common intention which they have communicated to each other because "[i]n an express contract, the meeting of the minds is manifested by offer and acceptance.").

{¶19} On July 13, Mr. Blair sent two emails to Mr. Ashmore, one delineated the per-pound price of each metal involved in the Phase I and Phase II purchases, removal plans for the Phase II materials, and mentioned the $20,000 deposit as well as the process for weighing and payment in full for the materials. The remaining July 13 email asked Mr.

Ashmore for written acceptance from the bank "on both * * * bids." An "offer" may be found where there is a " 'manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.' " *Reedy,* 143 Ohio App.3d at 521, 758 N.E.2d 678, quoting *Garrison v. Daytonian Hotel*, 105 Ohio App.3d 322, 325, 663 N.E.2d 1316 (2d Dist.1995). Therefore, because the terms of the July 13 email were such that all that remained was for NSBT's assent to form a binding agreement (and, indeed, they invited acceptance), this constituted an offer. *See SST Bearing Corp. v. MTD Consumers Group, Inc.*, 1st Dist. Hamilton No. C-040267, 2004-Ohio-6435, ¶ 16 (price quotation constituted valid offer where it included essential terms and all that was necessary was other party's acceptance); *Extreme Machine & Fabricating, Inc. v. Avery Dennison Corp.*, 2016-Ohio-1058, 49 N.E.3d 324, ¶ 25 (7th Dist.) (offer exists where terms are such that only the party's assent is needed to form a binding agreement).

{¶20} In response to these emails, Mr. Ashmore replied on July 14: "[T]his is to advise that the terms and conditions of your bid to purchase material from Trinity Aviation warehouse is accepted by North Side Bank[.]" In contract formation, "[t]he manifestation of assent by the offeree constitutes the acceptance." *McSweeney v. Jackson,* 117 Ohio App.3d 623, 632, 691 N.E.2d 303 (4th Dist.1996); *see Motorists Mut. Ins. Co. v. Columbus Fin., Inc.*, 168 Ohio App.3d 691, 2006-Ohio-5090, 861 N.E.2d 605, ¶ 8 (10th Dist.) ("[C]onduct sufficient to show agreement * * * constitutes acceptance."). Here, NSBT's answer in response to A&A Recycling's offer, which conveyed its assent to the terms, constituted a proper acceptance. In other words, at that point all the basic elements for contract formation were present, i.e., an offer, acceptance, and consideration in the form of A&A Recycling's promise to pay and its $20,000 deposit. *See Forbes v. Showmann, Inc.*, 1st Dist. Hamilton No. C-180325, 2019-Ohio-2362, ¶ 6 (under Ohio law consideration consists

11

of a benefit to the promisor or a detriment to the promisee); *Motorists Mut. Ins. Co.* at ¶ 8-9 (noting that basic requirements of contract formation are met when there is offer, acceptance, and consideration).

{¶21} This acceptance of A&A Recycling's terms evidenced the necessary "meeting of the minds" to create an enforceable contract as it expressed the parties' "common intention" as to the essential terms of the contract, i.e., that A&A Recycling purchased the materials located in Trinity Aviation's warehouse at the per-pound prices for each metal listed for Phase I and Phase II. *See Spoerke v. Abruzzo,* 11th Dist. Lake No. 2013-L-093, 2014-Ohio-1362, ¶ 20, 30, citing *Noroski v. Fallet,* 2 Ohio St.3d 77, 79, 442 N.E.2d 1302 (1982) ("To constitute a valid contract, there must be an offer on the one side and an acceptance on the other resulting in a meeting of the minds of the parties."); *Super Food Servs., Inc. v. Munafo, Inc.,* 1st Dist. Hamilton No. C-990383, 2000 WL 238027, *3 (Mar. 3, 2000) ("A 'meeting of the minds' is the manifestation of mutual assent by the parties."); *Altercare of Mayfield Village, Inc. v. Berner,* 2017-Ohio-958, 86 N.E.3d 649, ¶ 28 (8th Dist.), quoting *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgt., Inc.,* 87 Ohio App.3d 631, 620, 622 N.E.2d 1093 (8th Dist.1993) (meeting of the minds requires manifestation of intent to be bound and that the parties communicate " 'distinct and common intention' " to each other).

{¶22} In fact, it is difficult to understand what NSBT meant to convey based on these emails other than acceptance of a contractual offer. The bank protests, however, that the offer lacked sufficient definiteness with respect to the quantity term. *See Salameh v. Doumet,* 5th Dist. Delaware Nos. 19 CAF 01 0009 and 19 CAF 01 0008, 2019-Ohio-5391, ¶ 67, citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations,* 61 Ohio

12

St.3d 366, 369, 575 N.E.2d 134 (1991) ("[T]o declare the existence of a contract, the parties must consent to its terms, there must be a meeting of the minds of the parties, and the contract must be definite and certain."). The bank maintains that "without basic terms, such as the description and quantity of the goods, a contract may not exist." But here we find that the emails meet that burden with the requisite clarity, i.e., we can discern the contours of their agreement in a manner sufficient for its enforcement. *See First Natl. Bank of Omaha v. iBeam Solutions, L.L.C.*, 2016-Ohio-1182, 61 N.E.3d 740, ¶ 53 (10th Dist.) (terms of a contract must be reasonably certain and satisfied when they provide a basis for determining the existence of a breach and manner for providing an appropriate remedy); *Mr. Mark Corp v. Rush, Inc.,* 11 Ohio App.3d 167, 169, 464 N.E.2d 586 (8th Dist.1983) (same).

{¶23} To be sure, unlike many purchase contracts for the sale of goods, the correspondence here does not request x number of widgets. But the emails evidence the parties' agreement that A&A Recycling purchase "[a]ll material" located in Trinity's Building 13 in two phases, and that it agreed to payment on a per-pound basis for various metals, with a $20,000 deposit; which satisfies this inquiry. *Compare Episcopal Retirement Homes,* 61 Ohio St.3d at 369, 575 N.E.2d 134 (no contract existed where the court could not determine from writings "plans and specifications necessary for construction" nor "work timetable, monetary remuneration and other items[.]"); *see Alligood,* 72 Ohio App.3d at 311, 594 N.E.2d 668 (so long as court can discern that parties intended to be bound, less essential terms omitted may be fashioned in order to reach a "just result"). Moreover, this satisfies the writing requirements for contracts involving the sale of goods. *See Mezher v. Schrand*, 1st Dist. Hamilton No. C-180071, 2018-Ohio-3787, ¶ 8 (statute of frauds only requires writing to contain essential terms of the agreement); 1961 Official Comment, R.C. 1302.04 ("[R]equired writing need not contain all the material terms of the contract and * *

13

* need not be precisely stated. * * * The only term which must appear is the quantity term which need not be accurately stated[.]").

{¶24} NSBT also posits that no contract exists because of the confusion caused by the debtor's relocation of certain assets, resulting in "hopelessly commingled parts," and asserting that this justified the trial court's determination of no "meeting of the minds." The fact that subsequent events rendered performance of the contract (or an evaluation of its breach) more difficult, however, does not negate the validity or obligations of the contract. *See Coady Contracting Co. v. Brand Road Invest. Co., Ltd.*, 10th Dist. Franklin Nos. 88AP-986 and 88AP-1195, 1990 WL 80652, *4 (June 14, 1990), quoting *London & Lancashire Indem. Co. of Am. v. Bd. of Commrs. of Columbiana Cty.*, 107 Ohio St. 51, 140 N.E. 672 (1923), syllabus (" 'An express contract to do an act which is possible in the nature of things and not contrary to law will not be discharged by subsequent events * * * which do not render performance physically impossible, but merely make performance more burdensome[.]' "); *Leon v. State Farm Fire and Cas. Co.*, 2017-Ohio-8168, 98 N.E.3d 1284, ¶ 11 (8th Dist.) (contracting party not excused from performance because performance proved difficult or burdensome). Therefore, any possible difficulty that the parties may encounter in determining the extent of the purchased materials due to circumstances after the fact presents a problem of proof at trial rather than an impediment to contract formation.

{¶25} We clarify, however, that we reject A&A Recycling's more expansive argument based on its claimed entitlement to *all* Trinity inventory, regardless of where located. That is not what the emails provide; rather, they limit the scope of offer (and, by extension, acceptance) to the inventory in Building 13 at a certain time and thus the contract cannot extend beyond that. But what of inventory initially housed at Building 13 but subsequently

14

moved to other locations? Again, that represents a problem of proof that will have to be sorted out upon remand and not something that we can resolve on the present state of the record before us. NSBT may well be able to show that A&A Recycling knew of the relocation and thus such items (or maybe at least some of them) fell outside the scope of the contract; we express no view on the point.

{¶26} In sum, as the parties' writings contain all the basic elements for contract formation and demonstrate the required "meeting of the minds," they sufficed to create an enforceable contract between the parties, and we find that the trial court erred in declining to enforce the sale. This also obviated the need for the trial court to explore these issues at an evidentiary hearing because this legal determination should have been made as a threshold matter on the terms of the written record. We therefore sustain the A&A Parties' first assignment of error.

C.

{¶27} But the resolution of the contract question implicates the relief awarded for unjust enrichment. The trial court allowed unjust enrichment in light of the failure to establish a contract, and thus the A&A Parties cannot recover under both theories. *See Lehigh Gas-Ohio, L.L.C. v. Cincy Oil Queen City, L.L.C.*, 2016-Ohio-4611, 66 N.E.3d 1226, ¶ 24 (1st Dist.) (equitable action in quasi-contract for unjust enrichment not available when claim covered by an express contract); *Padula v. Wagner,* 2015-Ohio-2374, 37 N.E.3d 799, ¶ 48 (9th Dist.), citing *Ullmann v. May,* 147 Ohio St. 468, 476, 72 N.E.2d 63 (1947) ("Ohio law does not permit recovery under the theory of unjust enrichment when an express contract covers the same subject."). The A&A Parties acknowledge the point, conceding that success in establishing a contract wipes away the relief that they already obtained.

15

{¶28} Therefore, based on our resolution of the first assignment of error, we vacate the trial court's unjust enrichment award, which moots the A&A Parties' second assignment of error, challenging the trial court's award of unjust enrichment damages, and NSBT's cross-appeal disputing the same. On remand, the trial court should limit the case to breach of contract *unless* the A&A Parties can show entitlement to unjust enrichment for any inventory *not* located in Building 13 (i.e., inventory for which they have no contractual right, but can establish some basis for equitable relief). We express no view on whether the A&A Parties could succeed on such a claim, but only note that it remains theoretically possible consistent with our contractual ruling above.

III.

{¶29} We accordingly sustain the A&A Parties' first assignment of error, vacate the unjust enrichment remedies, and find A&A Parties' second assignment of error and NSBT's cross-appeal moot. We remand this case for further proceedings in accordance with this opinion.

Judgment accordingly.

**ZAYAS, P. J.,** and **CROUSE, J.,** concur.

Please note:

The court has recorded its own entry this date.