[Cite as *Maddali v. Haverkamp*, 2022-Ohio-3826.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| MEENA MADDALI, | : | APPEAL NO. C-210358 |
| | | TRIAL NO. A-1701584 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| ADAM MICHAEL HAVERKAMP, | : | |
| Defendant-Appellant. | : | |


Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed as Modified

Date of Judgment Entry on Appeal: October 28, 2022

*Stagnaro, Saba & Patterson Co., L.P.A.*, and *Sean Donovan*, for Plaintiff-Appellee,

*Heyman Law, LLC,* and *D. Andrew Heyman,* for Defendant-Appellant.

**WINKLER, Judge.**

**{¶1}** After her long-term romantic relationship with Adam Haverkamp ended, Meena Maddali sued Haverkamp alleging that he owed her money in accordance with oral agreements entered into during their relationship. Following a bench trial, the court found for Maddali on breach-of-contract claims. Haverkamp was ordered to pay Maddali the sum of $63,623.55, which included half of the net sale proceeds from a home they had purchased, $10,000 in proceeds from Maddali's student loan that Haverkamp used to pay off his credit cards, $13,357.27 that Haverkamp had charged to Maddali's credit card account, and $1,698.65 that Maddali had paid for Haverkamp's vehicle and his son's childcare. Haverkamp now appeals.

**{¶2}** In a single assignment of error, Haverkamp essentially challenges the legal sufficiency and weight of the evidence adduced at trial. Because we determine his challenge has merit with respect to Maddali's claims involving the vehicle and childcare expenses, but not with respect to her other claims, we reduce the amount of the judgment to $61,924.90, and affirm the judgment as modified.

### I. Background Facts and Procedure

**{¶3}** This is the second appeal involving the dispute between Maddali and Haverkamp. The record shows that the parties started dating in 2013. Haverkamp was divorced and had a young son. Several months into their relationship, the parties decided they wanted to live together and looked at several properties. Maddali wanted to rent and Haverkamp wanted to buy a home but could not afford to do so on his own. Haverkamp convinced Maddali to buy a home with him in the Anderson Township area near Cincinnati by telling her that the homes retain their value and promising her

2

that, if their relationship ended, then they would just sell the home and "split the profits" from the sale.

{¶4} The parties also agreed that Haverkamp would pay the down payment and the deed and mortgage would be solely in Haverkamp's name. The reason for this arrangement was in dispute, with Maddali testifying that Haverkamp thought he could curtail any future support obligations related to his divorce. Regardless of the reason, it was undisputed that this arrangement was not meant to eliminate Maddali's rights under the agreement. Their agreed-upon arrangement further required each to contribute equally to the maintenance and upkeep of the home, including paying half of the monthly expenses.

{¶5} The parties performed under this agreement for over two-and-one-half years. Maddali paid her half of expenses, represented by the monthly payment to the mortgage company, which included the mortgage payment and escrowed funds for insurance and real estate taxes. Maddali also devoted money and labor into improving the home, such as paying for new windows and gutters and updating the kitchen.

{¶6} The relationship eventually soured. Maddali moved out in April 2016 but offered to continue paying her share of the home's expenses. Haverkamp told her she did not need to do so. He further informed her that he would borrow money from his parents to pay her share of expenses and a "little bit more" to ready the home for sale. Haverkamp did not tell Maddali that he considered her actions a breach of their agreement.

{¶7} Haverkamp readied the property for sale and additionally made improvements to the home, such as finishing the basement, using money borrowed from his parents and labor contributed by family and friends. At trial, Maddali

3

disputed the cost and extent of the improvements, none of which Haverkamp had told her about.

{¶8} Haverkamp listed the property for sale in the summer of 2016 without notifying Maddali. He sold it in September 2016 for $224,000 and obtained over $81,000 in proceeds from the sale. Haverkamp did not share any proceeds with Maddali despite her request.

{¶9} In 2017, Maddali filed a complaint alleging that Haverkamp had failed to pay her in accordance with their agreement regarding the home. She additionally alleged that Haverkamp had failed to pay her for other funds she had expended during their relationship on his behalf with a promise of repayment. Maddali sought damages under various theories, including breach of contract, promissory estoppel, and unjust enrichment. Haverkamp filed counterclaims against Maddali.

{¶10} After discovery, Maddali moved for partial summary judgment on her claims. Haverkamp also moved for summary judgment on Maddali's claims and prevailed. In relevant part, the trial court determined that Maddali's claims sounded in palimony and therefore failed for lack of consideration. With respect to Haverkamp's counterclaims, Maddali moved for and was granted summary judgment. Maddali appealed. Haverkamp did not.

{¶11} This court reversed the summary judgment for Haverkamp on Maddali's claims. *See Maddali v. Haverkamp*, 1st Dist. Hamilton No. C-180360, 2019-Ohio-1518 ("*Maddali I*"). With respect to Maddali's breach-of-contract claims, we concluded her claims did not sound in palimony because the evidence in support of summary judgment demonstrated that Maddali was "not seeking to enforce a contract upon the basis of love and affection" but, rather, her claims arose from "the

money she spent in maintaining and renovating the household and monetary loans she made to Haverkamp for his personal obligations." *Id*. at ¶ 10.

{¶12} Additionally, we rejected Haverkamp's argument that, as a matter of law, the statute of frauds barred enforcement of the agreement related to the sale of the home due to a lack of a writing. We noted that even if the writing requirement applied, Maddali, who had paid the mortgage for almost three years and funded some renovations to the home, could remove the agreement from the statute of frauds by establishing part performance of the oral agreement. *Id*. at ¶ 13.

{¶13} This court also affirmed the trial court's denial of Maddali's motion for summary judgment, which was limited to the issue of Haverkamp's liability. With respect to the home, we held the evidence undisputedly established that the parties had "agreed to split the profits from the sale of the * * * home." *Id*. at ¶ 12 and 16. Nonetheless, we determined that genuine issues of fact precluded summary judgment in Maddali's favor with respect to liability for breach because "it [wa]s unclear from the record what the amount of 'profits' means." *Id*. at ¶ 16.

{¶14} Finally, with respect to Maddali's claims involving the "personal expenses," we concluded that an issue of fact existed "as to whether Maddali had loaned Haverkamp the money for th[o]se expenses, expecting to be paid back in full, or whether her payments were a gift to Haverkamp made during the course of a romantic relationship." *Id*. at ¶ 17.

{¶15} We remanded the cause for further proceedings on the remaining issues. An extensive bench trial was held on several dates between February and April 2021. The parties submitted written closing arguments. Maddali requested damages for Haverkamp's failure to pay her half of the net proceeds from the sale of the home,

5

which excluded Haverkamp's $4,200 down payment. She also requested damages for his failure to repay vehicle and childcare expenses, the proceeds from a student loan, and charges Haverkamp made to her American Express credit card. These last two items for which Maddali sought damages were not listed in Maddali's complaint, but the trial court permitted Maddali to testify at trial that she had advanced the funds for those expenses based on Haverkamp's express promise of repayment.

{¶16} The trial court found Haverkamp liable for breach of contract and awarded Maddali the damages she requested in her closing argument. This appeal followed.

## II. Analysis

{¶17} In a single assignment of error, Haverkamp contends the evidence does not support a judgment in Maddali's favor on any of her breach-of-contract claims. The issues presented implicate different standards of review. This court reviews de novo issues of law, including the sufficiency of the evidence. *See N. Side Bank & Trust Co. v. Trinity Aviation LLC*, 2020-Ohio-1470, 153 N.E.3d 889, ¶ 17 (1st Dist.).

{¶18} This court reviews fact finding under a deferential standard of review. When addressing a challenge to the manifest weight of the evidence, this court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed, and a new trial ordered. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. In weighing the evidence, we must presume that the findings of the trier of fact are correct, and if the evidence is susceptible of more than one construction, as a reviewing court, we must

give it that interpretation that is consistent with the verdict or finding and judgment. *See id.* at ¶ 21.

## Breach of Contract

{¶19} To prevail on a breach-of-contract claim, a plaintiff must demonstrate the existence of a contract, performance by the plaintiff, a breach by the defendant, and damages resulting from the breach. *See Fox Consulting Group, Inc. v. Mailing Servs. of Pittsburgh, Inc.*, 1st Dist. Hamilton No. C-210250, 2022-Ohio-1215, ¶ 8, citing *White v. Pitman*, 2020-Ohio-3957, 156 N.E.3d 1026, ¶ 37 (1st Dist.).

{¶20} Central to contract formation is a "meeting of the minds" on the essential terms of the agreement. This is usually demonstrated by an offer and acceptance, and consideration. "An offer is defined as 'the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude [the bargain].' Further, the essential terms of the contract, usually contained in the offer, must be definite and certain." *Reedy v. Cincinnati Bengals, Inc.*, 143 Ohio App.3d 516, 521, 758 N.E.2d 678 (1st Dist.2001), quoting *Garrison v. Daytonian Hotel*, 105 Ohio App.3d 322, 325, 663 N.E.2d 1316 (2d Dist.1995), cited in *N. Side Bank,* 2020-Ohio-1470, 153 N.E.3d 889, at ¶ 15.

{¶21} Oral promises may be enforceable provided there is "sufficient particularity to form a binding contract," notwithstanding an absence of formality. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, ¶ 15, quoted in *Kodu v. Medarametla*, 1st Dist. Hamilton No. C-160319, 2016-Ohio-8020, ¶ 9. An oral contract must be proven by clear-and-convincing evidence. *Kodu* at ¶ 9, citing *Clements v. Ohio State Life Ins. Co.*, 33 Ohio App.3d 80, 85, 514 N.E.2d 876 (1st

Dist.1986). The words and conduct of the parties disclose the intent to contract and the terms of the oral agreement. *See, e.g., Kodu* at ¶ 9, citing *Kostelnik*; *Rutledge v. Hoffman*, 81 Ohio App. 85, 86-87, 75 N.E.2d 608 (12th Dist.1947); *Lapoint v. Templeton*, 6th Dist. Fulton No. F-07-014, 2008-Ohio-1792, ¶ 35; *Hines v. Kelsch*, 1st Dist. Hamilton No. C-000445, 2001 Ohio App. Lexis 3606, *8-9 (Aug. 17, 2001).

**{¶22}** "While it is the function of a court to construe a contract, it is the province of the [fact finder] to ascertain and determine the intent and meaning of the contracting parties in the use of uncertain or ambiguous language." *See Amstutz v. Prudential Ins. Co. of Am.*, 136 Ohio St. 404, 408, 26 N.E.2d 454 (1940).

**{¶23}** With these standards in mind, we review the asserted arguments.

## A. Agreement with Respect to the Sale of the Home
## Existence and Meaning of the Contract

**{¶24}** Haverkamp contends that the trial court erred in determining there was a meeting of the minds with respect to what the parties meant by "split the profits," an essential term of the contract. Alternatively, he argues that if the court could assign a meaning to the term, then it erred by finding the parties intended to split the amount of the net proceeds from the sale, without reference to the cost of improvements.

**{¶25}** Maddali argues the trial court's decision is supported by clear-and-convincing evidence of an enforceable agreement to split the net proceeds of the sale. Alternatively, she contends the credible evidence presented at trial showed that Maddali and Haverkamp contributed approximately the same amount of money to improve the home. As a result, even if Haverkamp's testimony that "profits" meant the sale price minus the cost of improving and buying the property, each would be entitled to the same amount of credit or, as Haverkamp put it, reduction.

8

{¶26} We need not consider the validity of Maddali's alternate reasoning. We are persuaded that the balance struck by the trial court in weighing the evidence at trial was not erroneous. Clear evidence supports a determination that, when the parties entered into their agreement, they intended to split the gain in equity at the time of sale, measured by the money obtained at the sale minus the mortgage, the down payment, and closing costs, and that agreement was never modified.

{¶27} Initially, we agree with Haverkamp to the extent he argues that the parties must express their intent in a manner susceptible of judicial interpretation. If not, there is no requisite meeting of the minds and no legally enforceable agreement will result. *See Legros v. Tarr*, 44 Ohio St.3d 1, 6-7, 540 N.E.2d 257 (1989); *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 376, 683 N.E.2d 337 (1997); *N. Side Bank*, 2020-Ohio-1470, 153 N.E.3d 889, at ¶ 15.

{¶28} In *Maddali I*, upon our review of the evidence submitted in support of Maddali's motion for summary judgment, we noted that "it was unclear from the record what the amount of 'profits' means" despite the "undisputed fact that the parties agreed to split the profits from the sale" of the home.

{¶29} The technical meaning of "profit" is "[t]he excess of revenues over expenditures in a business transaction." *Black's Law Dictionary* 1246 (8th Ed.2004). The parties were undisputedly not involved in a business transaction that resulted in revenues. The way in which "profit" was used by the parties could not reasonably be afforded that meaning.

{¶30} The more general meaning of "profits" is "a valuable return: GAIN." *Merriam-Webster's Online Dictionary*, https://www.merriam-webster.com/dictionary/profit (accessed Oct. 20, 2022). The way in which the parties

9

used the term "profit" could reasonably be understood as (1) the gain in equity, measured by net proceeds from the sale, or (2) a gain calculated by reducing the amount earned in selling the property by the amount spent in buying and improving the property. As we alluded to in *Maddali I*, the parties proposed different meanings for the word profits, creating a factual dispute as to what amount the parties understood and agreed was subject to division at the time of sale.

**{¶31}** In this case, the trial court implicitly found that the term "split the profits," while ambiguous, was not so unclear as to prevent judicial enforcement. The court determined the parties used the term "profit" in the first sense referenced above—the gain in equity—and that Haverkamp's testimony otherwise was contrived. The evidence in the record concerning the intent of the parties, which includes the words used and conduct of the parties, amply supports these findings.

**{¶32}** At trial, Maddali testified that when she and Haverkamp used the term "split the profits," they specifically discussed and agreed the term meant they would split the gain in the home's value at the time of sale, minus the mortgage, the closing costs, and Haverkamp's down payment. In other words, the parties intended to split the gain in equity without regard to the costs of improvements. The parties' actions were consistent with this meaning. Maddali and Haverkamp split the expenses of home ownership and did not keep track of their contributions in money or labor while living there.

**{¶33}** Haverkamp testified that he understood "profits" to mean an amount calculated by reducing the amount earned in selling the property by the amount spent in buying and improving the property. This testimony was undermined by his failure to provide Maddali with credit for any of the funds she spent in improving the home.

10

**{¶34}**  To demonstrate that his understanding of the agreement related to the cost of improving the property, Haverkamp places great emphasis on his testimony that he would not have made the improvements to the home after Maddali moved out if he thought he would have to split with Maddali the increase of the home's value from the improvements.  However, Haverkamp also testified that he believed the agreement to "split the profits" was not enforceable after Maddali moved out of the home and stopped contributing to the home's maintenance and upkeep.

**{¶35}**  Ultimately, Haverkamp contradicted himself when testifying on several issues and did not produce credible evidence to support his positions.  For instance, he repeatedly testified that he had repaid his parents $30,000 for the cost of improvements, asserting that he had paid them periodically in cash withdrawn from his bank account, but he was unable to produce any documentary evidence in support.

**{¶36}**  In sum, Haverkamp has not demonstrated error by the trial court in finding the parties had agreed to split the net proceeds upon the sale of the home, and that Haverkamp had breached that contract when he failed to pay Maddali half of the net proceeds from the sale.

## Consideration

**{¶37}** Haverkamp also contends there was no binding contract due to the lack of consideration. We addressed the issue of consideration in *Maddali I* and determined that Maddali had provided consideration to support her breach-of-contract claim related to the home sale when she spent money maintaining and renovating the property. *See Maddali I*, 1st Dist. Hamilton No. C-180360, 2019-Ohio-1518, at ¶ 10. Thus, this issue was decided in *Maddali I*, and we have no reason to depart from our sound reasoning in that opinion, especially where one of Haverkamp's positions has been that Maddali breached the agreement involving "the splitting of the profits" when, after making the mortgage payments for over two-and- one-half years, she stopped.

## Statute of Frauds

**{¶38}** Haverkamp maintains that Maddali failed to present sufficient evidence to satisfy the doctrine of part performance. As this court explained in *Maddali I*, the doctrine of part performance can remove certain oral contracts from the statute of frauds when the party seeking to enforce the oral contract shows by "clear and convincing evidence" that her actions "were exclusively referable to the agreement" and that she changed her position to her prejudice. *Maddali I* at ¶ 13, quoting *Watts v. Fledderman*, 1st Dist. Hamilton No. C-170255, 2018-Ohio-2732, ¶ 25. Thus, assuming without deciding that the statute of frauds applied to the agreement, we rejected Haverkamp's argument that the lack of a writing warranted judgment in his favor.

**{¶39}** Haverkamp contends the evidence did not meet the clear-and-convincing standard. Maddali contends the evidence supports the trial court's

determination that she met her burden. We are unable to find error with the trial court's assessment of the evidence.

{¶40} First, Haverkamp admitted at trial that Maddali performed under the agreement regarding the home until May 2016. Additionally, the evidence demonstrated that before the parties entered into the agreement, Maddali was not living in the home or making the mortgage payments. Further, Maddali testified that her actions in making the mortgage payments and funding over $25,000 in property-related expenses was not because she was making a gift to Haverkamp or that she owed him rent, but because of the parties' oral agreement. Similarly, Haverkamp testified that Maddali did not make these payments as a gift or as a rent obligation. Finally, this same evidence showed that Maddali changed her position to her prejudice in reliance on the agreement. Ultimately, the trial court's finding that Maddali established part performance was supported by evidence that meets the clear-and-convincing standard. Thus, Haverkamp's challenge is unfounded.

{¶41} In summary, our review of the record discloses that Haverkamp has not demonstrated that the trial court erred by finding for Maddali on her breach-of-contract claim related to the sale of the home.

### B. Funds Advanced for Personal Expenses

{¶42} Haverkamp additionally challenges the trial court's determination that Maddali proved he had breached several alleged agreements to repay her for funds she advanced for his personal expenses during their relationship. This included the proceeds of a student loan and charges Haverkamp made to her American Express credit card account, and vehicle and childcare payments that Maddali made for Haverkamp.

### Student Loan Proceeds and Credit Card Charges

{¶43} Initially we focus on the student loan proceeds and the credit card charges. Maddali testified that Haverkamp had asked her to obtain a student loan and to provide him with $10,000 of the proceeds so that he could pay off his credit card debts. She further testified that in September 2016, when she obtained the loan, she provided Haverkamp the requested proceeds based on his express promise to repay her.

{¶44} Similarly, Maddali testified that during the relationship Haverkamp told her he had "maxed out" his credit card accounts and asked if she would make him an authorized user on her American Express credit card account. She did as he requested, but per her insistence, he agreed to pay her back for any charges he made.

{¶45} Maddali further testified that when the relationship became unstable and she asked for repayment, Haverkamp alluded to paying her out of home proceeds.

{¶46} Haverkamp acknowledged that he had used $10,000 from Maddali's student-loan proceeds to pay of his credit cards and did not dispute that he had charged over $12,000 to Maddali's credit card account. But he contended that he never promised to repay her and that she should not have expected repayment because he paid for many of her personal expenses during the relationship. He additionally argued that Maddali's actions demonstrated that these amounts were not advanced as loans, citing such things as her failure to include these items in her complaint and her failure to send written requests for repayment.

{¶47} We hold that the evidence on the student loan proceeds and the credit card charges was sufficient to show the existence of oral loan contracts. The expression of assent necessary to form a contract may be by word, act, or conduct

which evinces the intention of the parties to contract. *Rutledge*, 81 Ohio App. 85, 87, 75 N.E.2d 608; *Kodu*, 1st Dist. Hamilton No. C-160319, 2016-Ohio-8020, at ¶ 9. Maddali's testimony and exhibits, combined with Haverkamp's behavior, were sufficient to show that Haverkamp accepted these amounts with the understanding that the money was a loan. Moreover, on this record, we cannot say that the trial court lost its way when resolving the facts against Haverkamp.

### Vehicle and Childcare Expenses

{¶48} Haverkamp additionally contends there was insufficient evidence to support a finding that he breached an oral agreement to repay Maddali for his vehicle and childcare expenses. We agree.

{¶49} Maddali testified she had paid some of Haverkamp's vehicle and childcare expenses during the relationship. However, she failed to present clear evidence of an agreement for repayment. In point of fact, she testified that she was only seeking damages for half of the home sale proceeds, repayment of the student loan proceeds, and the American Express card charges. Notwithstanding this testimony, in her written closing argument, submitted months after her testimony, she requested damages for the vehicle and childcare expenses.

{¶50} We note that Haverkamp's written closing argument did not bring to the court's attention the contradiction in Maddali's position. Nonetheless, Haverkamp did argue that Maddali failed to establish a right to recover the funds. Upon our review of the record, we conclude that there was insufficient evidence for the court to find for Maddali with respect to the funds advanced for Haverkamp's vehicle and childcare expenses. For this reason, we sustain the assignment of error as to the vehicle and childcare expenses and overrule it in all other respects.

### III. Conclusion

**{¶51}** The trial court erred by finding for Maddali on her claim related to the repayment of Haverkamp's vehicle and childcare expense. Upon our conclusion that Haverkamp has not demonstrated any other errors in the proceedings below, we reduce the amount of the judgment accordingly to $61,924.90. This represents $38,567.63 for Maddali's half of the net home sale proceeds, $10,000 for the student loan proceeds, and $13,357.27 in credit card charges. We affirm that judgment as modified.

Judgment accordingly.

**MYERS, P.J.,** and **CROUSE, J.,** concur

Please note:

The court has recorded its entry on the date of the release of this opinion.