[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 22-12840

Non-Argument Calendar

————————————————

TEAM SERVICES INCORPORATED,
a New Jersey Corporation,

                                        Plaintiff-Appellant,

*versus*

SECURITAS ELECTRONIC SECURITY, INC.,
a Delaware corporation,

                                        Defendant-Appellee.

————————————————

Appeal from the United States District Court
for the Southern District of Florida

D.C. Docket No. 1:21-cv-21026-KMM

———————————————

Before ROSENBAUM, JILL PRYOR, and LAGOA, Circuit Judges.

PER CURIAM:

Team Services Incorporated ("Team") appeals the district court's orders that (1) granted summary judgment in favor of Securitas Electronic Security, Inc. ("SES") on Team's claims for breach of contract and account stated and (2) dismissed Team's claims for fraud, violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), and unjust enrichment. After careful review, we affirm.[1]

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This case concerns a contract dispute between Team and SES. Team is a nationwide service provider that offers preventive maintenance for banking and financial services equipment, which includes a network of technicians that "service[] bank vaults and electronic security systems." On January 1, 2017, Team and SES entered into a "Subcontractor Master Agreement" (the "Master Agreement"), under which Team agreed to provide services to SES's clients. The Master Agreement provides:

> SES may retain [Team] to provide certain products and/or services to SES and/or SES's customer(s) on SES's behalf including as applicable all the work,

———————————

[1] We grant Team's motion to correct its appendix.

labor, services, materials facilities, equipment, tools, scaffolds, appliances and other things necessary to deliver the products and services (collectively referred to as "Items"). . . .

No items are ordered by SES through execution of this Agreement alone. For Items to be ordered, a purchase order, work order or similar written or electronic document shall be issued by SES and provided to [Team] (hereinafter collectively and singly referred to as "Service Schedule.") Each such Service Schedule is deemed to be part of this Agreement. In the event of conflict between a Service Schedule and the provisions hereof, the provisions of this Agreement shall control. SES makes no representations or warranties regarding the amount of Items that will be ordered from [Team].

. . . .

All offers, acceptances, acknowledgements and purchases of the Items shall be governed exclusively by the terms and conditions set forth herein. Acceptance by [Team] of any request by SES to provide Items is limited to the terms and conditions herein, and any terms or conditions proposed by [Team] which differ from, are inconsistent with, or which are in addition to those stated herein, are objected to by SES. No additional or inconsistent terms proposed by [Team] shall become part of any contract to purchase the Items. SES's acceptance of any offer to provide Items which may be presented by [Team] is expressly conditional on [Team's] assent to all of the terms and

conditions set forth herein, including those terms herein which may differ from, be inconsistent with, or be in addition to the terms of [Team's] offer.

. . . .

The sum to be paid by SES, out of funds received from the Owner, to [Team] for the satisfactory performance and completion of the Items and of all of the duties, obligations, and responsibilities of [Team] under this Agreement and the other Contract Documents shall be set forth in the Service Schedule.

On January 4, 2018, Team sent SES a pricing proposal for its 2018 calendar year services, which SES accepted. On January 15, 2018, SES emailed Team the list of states that SES intended to award Team as Team's assigned service area for 2018. This list was included in a "Statement of Work" for 2018 (the "2018 SOW"), which Team executed on January 19, 2018. The 2018 SOW required Team to complete the preventive maintenance inspections ("PMs") it was awarded as follows: 20 percent in the first quarter; 30 percent in the second quarter; 30 percent in the third quarter; and 20 percent in the fourth quarter, with all fourth quarter PMs completed by the end of November 2018 so that an audit could be conducted in December 2018 to ensure all PMs were completed. The 2018 SOW expired on December 31, 2018.

On November 2, 2018, Team sent SES a pricing proposal for the 2019 calendar year, keeping Team's rates the same as they were in 2018. SES replied to Team on December 9, 2018, thanking Team for submitting a bid for the 2019 calendar year, listing the rates it

wanted to pay Team, and asking Team to confirm its acceptance of the proposed pricing, after which SES would notify Team of its assigned states for 2019.  The next day, Team responded:

> We recognize that the prices below are a reduction in our current rates, though, in the spirit of our continued partnership, we are willing to accept the pricing below, contingent upon keeping a minimum of our current footprint. We will need to continue our current footprint in order to adhere to this pricing, and in addition we would need to keep our current payment terms.
>
> If we could expand our area of coverage, we would be willing to discount these prices even further.
>
> We should have a call and review this live.

In response, SES thanked Team for "acceptance of the updated pricing" but stated that it could not "guarantee any volumes" and that "[t]he assignment of states is still under review."  Team later responded to SES, stating that "[i]n order to accept that pricing we need to see it [sic] works out financially for Team" and noting that it "took on western states and Alaska at no additional charge to SES this year," which "was factored into the volume of business received."  Soon after, Team also responded that "[h]opefully states are awarded soon so we can get calls loaded and people in the field working in January."

On December 20, 2018, Team emailed SES about 2019 calls that Team scheduled with one of SES's clients, based on the geographic footprint SES awarded Team in 2018.  This email stated

that Team "made a lot of changes recently to help eliminate the frustrations [SES had] been dealing with for the past few years" and had "set goals to provide an incredible job with the work you decide to assign to Team." The email further provided that Team had received and scheduled all of the client's calls and asked whether Team should continue with its schedule or whether the calls would go to a different vendor." The email also acknowledged that Team had not completed 100 percent of its calls for 2018 year, despite being required to have completed all calls before December 2018 under the 2018 SOW. In response, SES stated that Team would "not have the same footprint so scheduling calls in states [it did] not have will not work." The next day, SES informed Team via email that it "will be part of the PM Inspection process for 2019," attaching the states awarded. Team's president forwarded this email to other Team employees, stating, "Here's the big goose egg." And the parties entered into another "Statement of Work" for 2019 (the "2019 SOW"). The 2019 SOW assigned Team a smaller service area than in 2018 and stated, "Refer to submitted pricing for 2019 rates for states awarded." The parties, however, dispute whether the 2019 SOW is a valid contract as to the specific pricing terms.

On January 10, 2019, Team emailed invoices to SES for the week of January 3, 2019, to January 9, 2019. On January 7, 2019, Team asked SES why its invoices were "short paid" and noted its accounting department had not received "correspondence from anyone that referenced what these amounts were deducted for." Team emailed another set of invoices to SES on January 24, 2019,

for the week of January 17, 2019, to January 23, 2019.  Then, on February 2, 2019, SES requested Team via email to adjust the pricing on the invoices to the 2019 rates and resubmit them for approval.

The February 2 email was forwarded internally within Team.  One Team employee asked about the terms of the contract, to which the Team president replied,

> Nothing.  We did not sign anything.  Under same pricing as last year 2018.  When they asked for lower pricing during the RFP 2019 I said we would need the same volume or more in order to accept those prices.  They reduced our workload and they have nothing in writing at this time. . . .
>
> My concern is getting payment this week.

On February 4, 2019, Team resubmitted invoices for the January 3 period via email, stating that "[t]he pricing has been adjusted to the 2019 rates however we had some calls from 2018 that still have 2018 rates."

On February 15, 2019, Team's president emailed SES to ask about the payment of pending invoices.  SES responded that fifty-eight of the invoices in question were submitted with the wrong rates and that Team's accounting department was working to correct them.  Team's president disputed that those were the "wrong rates," stating that "[t]hose rates were not approved" and that the "original rates were correct on the invoices."

SES subsequently terminated its relationship with Team, although the parties dispute the reason. Team claims that SES terminated the relationship in retaliation for its payment demands, while SES claims it fired Team for poor performance and due to complaints from its clients.

On March 16, 2021, Team filed suit against SES. After SES moved to dismiss the complaint, the district court allowed Team to amend its complaint to correct pleading defects. Team subsequently filed an amended complaint, which raised the following claims: (1) breach of contract; (2) fraud in the inducement; (3) fraudulent misrepresentation; (4) violation of FDUTPA; (5) unjust enrichment; and (6) account stated.

SES moved to dismiss the amended complaint under Federal Rule of Civil Procedure 12(b)(6) as to Team's claims for fraud, violation of FDUTPA, and unjust enrichment. SES argued that the fraud claims failed to state a claim as a matter of law because the alleged fraud claims were not distinct from the alleged breach of contract claim and were directly related to and intertwined with SES's obligations under the Master Agreement. SES alternatively argued that the fraud claims violated Federal Rule of Civil Procedure 9(b) because they were not pled with sufficient particularity. As to the FDUTPA claim, SES argued that Team failed to allege deceptive conduct that occurred in Florida. And, as to the unjust enrichment claim, SES argued that it was not viable because Team had a valid contract with SES. Team opposed SES's motion.

On August 9, 2021, the district court granted SES's motion to dismiss. The court found that Team's fraud claims directly related to SES's breach of contract and that Team failed to plead facts to support the claims independently, e.g., any facts to suggest SES made a false statement before the parties entered into the 2019 SOW. The court explained that Team's allegation that SES "ultimately did not pay the rates agreed to supports a breach of contract claim, not an independent tort claim for fraud." And the court found Team's allegation that SES misrepresented it would investigate billing discrepancies could be adequately addressed through the breach of contract claim. The district court dismissed the FDUTPA claim because Team did not allege any unfair, deceptive, or unconscionable practice that occurred within Florida and because Team's reliance on SES being subject to personal jurisdiction in Florida was inapposite. Finally, the district court dismissed the unjust enrichment claim because, under Florida law, a plaintiff could not pursue such a claim when an express contract existed, and Team alleged the existence of a contract.

Following the dismissal order, SES filed an answer and affirmative defenses to the amended complaint on September 17, 2021. The case proceeded to the discovery phase on Team's remaining claims.

In a pre-trial scheduling order, the district court set the trial for a two-week period beginning on January 31, 2022, and ordered all discovery to be completed 100 days before trial—i.e., by October 23, 2021. Team served its first request for production on SES

on September 8, 2021, and SES served its responses and objections thereto on October 8, 2021.

Then, on November 12, 2021, SES moved for summary judgment.  SES argued that, as to the breach of contract claim, the undisputed material facts showed that SES did not breach a contract with Team by failing to compensate Team at the higher rates Team proposed.  SES noted that no evidence showed that SES agreed to pay Team at the 2018 rates for the 2019 calendar year and, as such, SES did not breach the Master Agreement or the 2019 SOW.  Instead, SES asserted that Team accepted the lower pricing proposed by SES in late 2018 even after being advised several times that Team would not have the same territory.  As to the account stated claim, SES asserted that the undisputed evidence demonstrated that SES did not agree to compensate Team in 2019 based on the 2018 rates and that SES did not agree to the amount in the invoices first submitted to SES by Team.  Along with its summary judgment motion, SES filed a statement of undisputed facts and accompanying exhibits.  Team opposed this motion.

A week after SES moved for summary judgment—and several weeks after the October 23 discovery deadline—Team moved to compel discovery.  Team asserted that no responsive documents were provided with SES's response to Team's discovery requests. According to Team, on November 4, 2021, Team contacted SES to coordinate a meet and confer regarding the lack of responsive documents and the challenges raised to SES's objections.  Then, on November 8, 2021, SES "provided some discovery responses" as

well as a privilege log. After another meet and confer attempt, SES maintained that Team's requests relating to 2017 and 2018 were irrelevant and that various communications were privileged because they involved SES's in-house counsel. Thus, Team stated it "was left with no choice but to move to compel discovery."

On November 29, 2021, a magistrate judge denied Team's motion to compel. The magistrate judge found that Team failed to explain the motion's untimeliness, as it was filed after discovery closed on October 23, 2021, and after dispositive motions were due on November 12, 2021, per the court's scheduling order. The magistrate judge also found that the motion was untimely under S.D. Fla. Local Rule 26.1(g), which required discovery disputes be raised within thirty days of the original due date of the response to the discovery request.

Team objected to the denial of its motion to compel the next day. Team asserts the objection was never addressed, but the clerk of court filed a notice to Team's objection that it contained a "login/signature block violation" requiring "corrective action" because the account name of the attorney e-filing the document did not match the name of the attorney on the signature block of the motion. Team, however, did not file a corrected motion.

Team also moved to extend the time to complete discovery—seeking leave for the parties to take two depositions—which the district court denied in a paperless order. In denying the motion, the court explained that the discovery deadline was on

October 23, 2021, and the parties' failure to recognize that they may be violating the local rules was not sufficient to show good cause.

On January 6, 2022, the district court granted SES's motion for summary judgment. As to the breach of contract claim, the district court began by noting that the parties did not dispute the timeline or the contents of the correspondence negotiating the 2019 SOW; rather, they disputed "the characterizations of their correspondence, i.e., whether certain communications constituted an acceptance of an offer as opposed to a rejection and counteroffer." The district court also noted that Team had changed its position on whether an agreement existed as to price, as in its amended complaint it stated that there was a valid contract but, in its summary judgment response, argued that its acceptance of the lower 2019 rates was contingent upon being awarded the same service area as 2018, and thus a counteroffer. Despite arguing that a counteroffer implied a rejection of an offer, Team sought to hold SES to its initial pricing bid. While Team had submitted an affidavit from its president stating that it was Team's understanding that its 2019 bid was the controlling price because it had been awarded a smaller service area, the court explained that a contract must reflect the essential terms, including price, with requisite definiteness and certainty. The district court also noted that Team now asserted SES's submission of the 2019 SOW raised an ambiguity as to the correct pricing and appeared to take the position that the 2019 SOW was not a valid contract as to the price term, as it disputed the statement in SES's statement of facts that the 2019 SOW was a valid contract

between the parties. Given Team's new position, the district court found that there could be no breach of contract to the extent Team claimed SES breached the 2019 SOW. And the district court noted that Team had not identified any particular provision of the Master Agreement that SES breached.

As to the account stated claim, the district court first noted that it found that the undisputed evidence showed the parties did not agree on a price for 2019 and that Team now appeared to argue the 2019 SOW was not a valid contract as to price. The district court further found that there was no evidence that SES separately assented to the invoices, as the record showed that SES did not agree to pay Team's invoices at the 2018 rates for services performed in 2019.

Team then moved for reconsideration of the district court's grant of summary judgment, as well as its previous dismissal of its claims for fraud, violation of FDUTPA, and unjust enrichment. The district court denied Team's motion. In addition to recounting its previous reasoning in granting summary judgment, the court rejected Team's argument that SES accepted Team's rate by providing the 2019 work because the live counteroffer from SES consisted of SES's proposed 2019 lower rates for a smaller geographic area. The district court found that Team's previous contingent counterproposal was no longer live because it had been rejected.

Further, as to the account stated claim, the district court found that Team had not narrowed its claim to any particular year,

i.e., services performed in the 2018 calendar year at the 2018 rate. The district court noted there were no allegations in the amended complaint, nor was it clear from Team's statement of amounts due, that invoices for work performed in 2018 went unpaid. And the district court found that Team could not satisfy the high burden for reconsideration through its vague representations that it became aware "during the final stages of the case" that "several of the pending invoices were [for] services performed in the 2018 calendar year which were subject to the 2018 SOW and the 2018 rates, and not the 2019 SOW and the 'disputed rate.'"

As to Team's request that the district court reconsider its dismissal of its other claims because its summary judgment order conflicted with the dismissal order, the district court explained that different standards of review applied for motions to dismiss and for summary judgment. And the district court found that its order, which considered the evidence in the case, did not conflict with its dismissal order, which was limited to the amended complaint's allegations.

This appeal ensued.

## II.    STANDARDS OF REVIEW

We review *de novo* an order granting a motion for summary judgment. *Carithers v. Mid-Continent Cas. Co.*, 782 F.3d 1240, 1245 (11th Cir. 2015). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We "view the evidence and all factual inferences

therefrom in the light most favorable to" the non-movant. *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999)). "A factual dispute is genuine only 'if the evidence is such that a reasonable [factfinder] could return a verdict' for the non-moving party." *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir. 2001) (alteration in original) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)). Once the moving party has properly supported its motion for summary judgment, the burden then shifts to the non-moving party to "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Bailey*, 284 F.3d at 1243 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

We also review an order granting a motion to dismiss *de novo*, accepting the factual allegations in the complaint as true and construing them in the light most favorable to the plaintiff. *Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010). "In appeals of Rule 12(b)(6) dismissals, it is generally true that the 'scope of the review must be limited to the four corners of the complaint.'" *Id.* (quoting *St. George v. Pinellas County*, 285 F.3d 1334, 1337 (11th Cir. 2002)).

We also review a district court's rulings on discovery matters for an abuse of discretion. *Khoury v. Miami-Dade Cnty. Sch. Bd.*, 4 F.4th 1118, 1125 (11th Cir. 2021). And we review the denial of a motion for reconsideration for an abuse of discretion. *United States v. Llewlyn*, 879 F.3d 1291, 1294 (11th Cir. 2018).

### III.    ANALYSIS

On appeal, Team argues that the district court erred in granting summary judgment in favor of SES because there are genuine issues of material fact as to its breach of contract and account stated claims.  Team further argues that the district court erred in dismissing its alternative theories of relief for fraud, violation of FDUTPA, and unjust enrichment.  We address these issues in turn.

### A.  Team's Breach of Contract and Account Stated Claims

We begin with Team's breach of contract claim.  On appeal, Team argues that the evidence shows it did not agree to reduce its rates unless an equal or larger work footprint was awarded, which never occurred.  Team asserts that it "logically follows" that because SES did not provide an equal or greater footprint than awarded to Team in 2018, it did not agree to lesser rates.  Team further argues that, at the very least, the 2019 SOW's statement of "[r]efer to submitted pricing for 2019 for the states awarded" is an ambiguous term of an undisputed agreement.  Team also contends that the district court misapprehended its argument about the "submitted pricing" as meaning there was no contract between the parties.

"A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and

22-12840              Opinion of the Court                    17

damages or loss resulting from the breach."[2] *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 453, 469 (Ohio 2018); *see Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 953 (Fla. Dist. Ct. App. 2017) ("To prevail in a breach of contract action, a plaintiff must prove: (1) a valid contract existed; (2) a material breach of the contract; and (3) damages."). The existence of a contract is a question of law. *N. Side Bank & Tr. Co. v. Trinity Aviation, LLC*, 153 N.E.3d 889, 895 (Ohio Ct. App. 2020). For a contract to exist, "a meeting of the minds between the contracting parties must occur, demonstrated by offer, acceptance, and consideration," and the contract must "reflect the 'essential terms,' with requisite definiteness and certainty." *Id.* at 894–95; *see Sam Rodgers Props., Inc. v. Chmura*, 61 So. 3d 432, 437 (Fla. Dist. Ct. App. 2011) (explaining that a breach of contract requires proof of the parties' mutual assent on all essential terms of their agreement). And price is an "essential term of a contract, without which there cannot be an enforceable contract." *Grimmer v. Shirilla*, 76 N.E.3d 363, 368 (Ohio Ct. App. 2016); *see Sam Rodgers*, 61 So. 3d at 437 ("Price is typically an essential element of a contract.").

---

[2] Below, Team asserted that Ohio law, not Florida law, applied to its claims based on the terms of the Master Agreement. The district court did not resolve the issue and considered both Ohio and Florida law, as the laws of both states were consistent on the requirements to establish a claim for breach of contract and for account stated. The parties do not challenge the district court's approach, and because Ohio and Florida law are consistent on the requirements for breach of contract and account stated claims as relevant to this appeal, we take the same approach.

Additionally, under Ohio law, "[w]hen an offer is rejected, it ceases to exist, and a subsequent attempted acceptance is inoperative to bind the offeror." *Garrison v. Daytonian Hotel*, 663 N.E.2d 1316, 1318 (Ohio Ct. App. 1995); *see Pena v. Fox*, 198 So.3d 61, 63 (Fla. Dist. Ct. App. 2015) (explaining that, under Florida law, "an acceptance of an offer must be absolute and unconditional, identical with the terms of the offer" (quoting *Ribich v. Evergreen Sales & Serv., Inc.*, 784 So. 2d 1201, 1202 (Fla. Dist. Ct. App. 2001))). And "[a] rejection is implied in a counteroffer, which is 'interpreted as being in effect a statement by the offeree not only that he will enter into the transaction on the terms stated in his counteroffer, but by implication that he will not assent to the terms of the original offer.'" *Garrison*, 663 N.E.2d at 1318 (quoting 1 Williston On Contracts, § 5:3 (4th ed. 1990)); *see Pena*, 198 So. 3d at 63 (similar).

And "interpretation of a contract, including whether it is ambiguous, is a question of law that we review de novo." *S. Coal Corp. v. Drummond Coal Sales, Inc.*, 28 F.4th 1334, 1341 (11th Cir. 2022); *accord In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) ("Under Ohio law, contract interpretation, including a determination as to whether a contract is ambiguous, is a question of law."). "If the language of the contract is ambiguous, the intent of the parties becomes a question of fact." *Cadle v. D'Amico*, 66 N.E.3d 1184, 1188 (Ohio Ct. App. 2016). "[I]f a contract's 'language is unclear, indefinite, and reasonably subject to dual interpretations or is of such doubtful meaning that reasonable minds could disagree as to its meaning,' then it is ambiguous as a

matter of law." *Fifth Third*, 925 F.3d at 276 (quoting *Cadle*, 66 N.E.3d at 1188).

We conclude that the district court did not err in granting summary judgment in favor of SES on Team's breach of contract claim. First, Team has identified no provision that SES breached in the Master Agreement. And second, reviewing the record evidence and all factual inferences in the light most favorable to Team, the parties never agreed to the essential term of pricing in the 2019 SOW. Indeed, Team submitted a bid for the 2019 SOW and, in response, SES submitted a counteroffer with lower pricing for the year. In doing so, SES rejected Team's offer for pricing. *See Garrison*, 663 N.E.2d at 1318; *Pena*, 198 So. 3d at 63. Team then responded to SES's counteroffer by stating it was "willing to accept the pricing . . . , contingent upon keeping a minimum of [its] current footprint." SES responded by thanking Team for the acceptance of the updated pricing and advising Team that the assignment of states was still under review. But SES ultimately awarded Team with less states than its footprint for the 2018 year. And no evidence shows that SES agreed to higher pricing for 2019 in the event that it awarded Team fewer states.

Thus, on this record, there is no ambiguity in the 2019 SOW for us to resolve as to pricing; rather, the parties never reached a meeting of the minds as to the essential term of pricing for the 2019 SOW. *See N. Side Bank*, 153 N.E.3d at 985; *Sam Rodgers*, 61 So. 3d at 437. Accordingly, there was no valid contract between the parties as to pricing in the 2019 SOW as a matter of law, and Team's breach

20                    Opinion of the Court                    22-12840

of contract claim therefore fails.[3]  *See Lucarell*, 97 N.E.3d at 469; *Deauville*, 219 So. 3d at 953.

Turning to Team's account stated claim, Team argues that the "pricing dispute" between the parties was material and should have been presented to a finder of fact.  Team also argues that the district court erred in denying its motion for reconsideration on the claim because it showed that unpaid invoices included work for states that were part of the 2018 SOW, not the 2019 SOW.

A claim for account stated requires "an agreement between parties, express or implied, based upon an account balanced and rendered." *AJ Amatore & Co. v. Sebastiani*, 149 N.E.3d 136, 140 (Ohio Ct. App. 2019); *see Farley v. Chase Bank, U.S.A., N.A.*, 37 So. 3d 936, 937 (Fla. Dist. Ct. App. 2010) ("[A]n account stated has been defined to be 'an agreement between persons who have had previous transactions, fixing the amount due in respect of such transactions, and promising payment.' . . . Proof of an account stated requires an express or implied agreement between the parties that a specified balance is correct and due and an express or implied promise to pay this balance." (quoting *Martyn v. Amold*, 18 So. 791, 793 (Fla. 1895))). An account stated exists "only where accounts have been examined and the balance admitted as the true balance between the parties,

---

[3] For similar reasons, we conclude that the district court did not abuse its discretion in denying Team's motion for reconsideration of the breach of contract claim.  *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1344 (11th Cir. 2010) (explaining that a motion for reconsideration cannot be used to relitigate old matters or arguments).

without having been paid," i.e., "based upon an assent to its correctness." *AJ Amatore*, 149 N.E.3d at 141 (quoting *Creditrust Corp. v. Richard*, No. 99-CA-94, 2000 WL 896255 (Ohio Ct. App. July 7, 2000)); *see Farley*, 37 So. 3d at 937 (noting that "a prima facie case for the correctness of the account and the liability of the debtor has been made" if the debtor does not object to the correctness of the amount on the account stated within a reasonable time).

The district court did not err in granting summary judgment in favor of SES on Team's account stated claim. As the record evidence shows, SES did *not* agree to pay Team's invoices at the 2018 rates for services performed in 2019. Rather, after Team submitted two sets of invoices to SES, SES requested Team to resubmit its invoices at a lower rate. Thus, SES did not assent to the correctness of the invoices, as required for an account stated claim under Ohio or Florida law.

We also conclude that the district court did not abuse its discretion in denying Team's motion for reconsideration as to its account stated claim. As we have long stated, the only grounds for granting a motion for reconsideration "are newly-discovered evidence or manifest errors of law or fact." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1344 (11th Cir. 2010) (quoting *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007)). Such a motion cannot be used "to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Id.* (quoting *Arthur*, 500 F.3d at 1343).

The district court found that Team had made vague representations that it became aware "during the final stages of the case" that "several of the pending invoices were [for] services performed in the 2018 calendar year which were subject to the 2018 SOW and the 2018 rates, and not the 2019 SOW and the 'disputed rate.'" Team appears to argue that the district court should not have granted summary judgment as to work it performed in 2019 that was in fact part of its 2018 SOW, due to Team's delay in completing the 2018 SOW. But the district court did not abuse its discretion in denying Team's motion for reconsideration on this point. First, Team could have made this argument before the entry of summary judgment. *See id.* Nor do we find any manifest error of law or fact in the district court's ruling, as Team did not present evidence that SES assented to the correctness of the invoices.

Finally, we address Team's discovery-related arguments about its claims. Team argues that the magistrate judge erred in denying its motion to compel discovery and the district court erred in denying its joint motion with SES to extend discovery to take two depositions. We disagree.

"District courts have 'unquestionable' authority to control their own dockets," and "[t]his authority includes 'broad discretion in deciding how best to manage the cases before them.'" *Smith v. Psychiatric Sols., Inc.*, 750 F.3d 1253, 1262 (11th Cir. 2014) (first quoting *Canada v. Mathews*, 449 F.2d 253, 255 (5th Cir. 1971); then quoting *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997)). A district court is authorized to enter a scheduling order

under Federal Rule of Civil Procedure 16(b), and "[a] schedule may be modified only for good cause and with the judge's consent." Fed R. Civ. P. 16(b)(4). The party seeking modification bears the burden of showing good cause, and the good cause standard "precludes modification [of the scheduling order] unless the schedule cannot be met despite the diligence of the party seeking the extension." *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1232 (11th Cir. 2008) (alteration in original) (quoting *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998)).

Here, Team's November 19, 2021, motion to compel discovery was filed several weeks after the district court's deadline for discovery on October 23, 2021, and a week after its November 12, 2021, deadline for dispositive motions, per the court's scheduling order. But as the magistrate judge found, Team did not offer any explanation showing good cause for the untimeliness of the motion—both as to the motion being untimely under the court's scheduling order and for Team's failure to comply with Local Rule 26.1(g), which required discovery disputes be raised within thirty days of the original due date (here, October 8, 2021) of SES's response to Team's discovery request. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1302 (11th Cir. 2009) (explaining that this Court gives great deference to a district court's interpretation of its local rules and reviews its application of those rules for an abuse of discretion). Given that Team did not offer any explanation in its motion to compel as to good cause, we find no abuse of discretion in the magistrate judge denying that motion for being untimely under the

district court's scheduling order and Local Rule 26.1(g).[4] *See id.* ("In order to meet the abuse of discretion standard, Plaintiffs bear the burden of showing that the district court made a clear error of judgment.").

Team also moved to extend the time to complete discovery. The district court denied the motion in a paperless order, explaining that the discovery deadline was on October 23, 2021, and that the parties' failure to recognize that they may be violating the local rules did not create good cause. For similar reasons to Team's motion to compel, we conclude that the district court did not abuse its discretion in enforcing the deadlines in its scheduling order and denying this motion, which was filed more than a month after its October 23, 2021, discovery deadline.

We thus conclude that the district court did not err in granting summary judgment for SES on Team's breach of contract and account stated claims.

---

[4] In its brief, Team recognizes that its motion was "candidly untimely" but points to the arguments it made in its objection to the magistrate's order as constituting good cause. First, as we have noted, this objection was struck by the clerk of court because it contained a "login/signature block violation" requiring "corrective action" because the account name of the attorney e-filing the document did not match the name of the attorney on the signature block of the motion. Team, however, did not file a corrected motion as ordered by the clerk. Moreover, we cannot say it was an abuse of discretion for the court to not consider Team's belated explanation for why its motion was filed weeks after the discovery deadline.

### B. Team's Motion for Reconsideration as to the Dismissal of Its Other Claims

Team also contends that the district court erred in denying its motion for reconsideration as to Team's claims for fraud, violation of FDUTPA, and unjust enrichment that the district court previously dismissed. Team argues that the district court's summary judgment order created an "inconsistency" in the case because it found that there was no valid contract as to price but had previously found its alternative theories of relief failed because of the existence of a contract at the dismissal stage. Team contends that, if there is no contract, then it should not be barred from bringing forth its alternative theories of relief and that the district court's denial of its motion violates its due process rights.

In its dismissal order, the district court found Team's fraud claims directly related to SES's breach of contract and that Team failed to plead facts to support the claims independently. As to the FDUTPA claim, the court found that Team did not allege any unfair, deceptive, or unconscionable practice that occurred within Florida. And, as to the unjust enrichment claim, the district court dismissed it because, under Florida law, a plaintiff could not pursue such a claim when an express contract existed. Further, in denying the motion for reconsideration, the district court explained that different standards of review applied to motions to dismiss and motions for summary judgment. The court also explained that it was not convinced Team had established its order granting summary judgment, which considered the evidence in the case, conflicted

with its dismissal order, which was limited to the amended complaint's allegations.

We first address the fraud and unjust enrichment claims. To state a claim for fraudulent misrepresentation, the plaintiff must show: "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." *Butler v. Yusem*, 44 So. 3d 102, 105 (Fla. 2010) (quoting *Johnson v. Davis*, 480 So. 2d 625, 627 (Fla. 1985)); *see Ferro Corp. v. Blaw Knox Food & Chem. Equip. Co.*, 700 N.E.2d 94, 99 (Ohio Ct. App. 1997) (requiring similar elements under Ohio law). To establish a claim for fraud in the inducement, the plaintiff must show that: (1) the representor made a false statement that concerned a material fact; (2) the representor knew or should have known that the representation was false; (3) the representor intended to induce another party to act in reliance on that false statement; and (4) the party acted in reliance on the representation and, as a result, was injured. *Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1031 (11th Cir. 2017); *see ABM Farms, Inc. v. Woods*, 692 N.E.2d 574, 578 (Ohio 1998) (requiring the same elements under Ohio law).

Under the independent tort doctrine, however, "[m]isrepresentations relating to the breaching party's performance of a contract do not give rise to any independent cause of action in tort, [where] such misrepresentations are interwoven and indistinct from the heart of the contractual agreement." *Sun Life Assurance*

*Co. of Can. v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1223 (11th Cir. 2018) (alterations in original) (quoting *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1316 (11th Cir. 2007)); *accord Glob. Quest*, 849 F.3d at 1031 (explaining that "a fraudulent inducement claim still must be independent of a breach of contract claim"). Rather, "for an alleged misrepresentation regarding a contract to be actionable, the damages stemming from that misrepresentation must be independent, separate and distinct from the damages sustained from the contract's breach." *Peebles v. Puig*, 223 So. 3d 1065, 1068 (Fla. Dist. Ct. App. 2017); *see Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1270 (Ohio Ct. App. 1996) ("A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract. . . .").

Additionally, as to a claim for unjust enrichment, "a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter." *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. Dist. Ct. App. 2008); *see HAD Enters. v. Galloway*, 948 N.E.2d 473, 478 (Ohio Ct. App. 2011) ("[A] party may not recover for unjust enrichment when an express contract is involved.").

We thus conclude that the district court did not abuse its discretion in denying Team's motion for reconsideration as to the dismissal of its fraud and unjust enrichment claims. As the district court found, Team alleged the existence of an express contract with

SES, which precluded its unjust enrichment claim. Team says that it stated a claim because it asserted the unjust enrichment count in the alternative and did not allege in that count that an express contract existed. But in the amended complaint Team alleged that SES was liable for unjust enrichment because it had failed to pay Team "the full *contract* price." Because the unjust enrichment claim rested on an allegation that SES failed to pay Team the agreed-upon amount for work Team performed in 2019, we conclude that Team failed to state a claim for unjust enrichment.

We also conclude that Team failed to state a claim for fraud. Team's fraud allegations were directly related to SES's alleged failure to pay for services rendered under the 2019 SOW, meaning its fraud claims were precluded by the independent tort doctrine. At the motion to dismiss stage, the district court was required to accept Team's factual allegations that there was a valid contract between the parties as to pricing as true and could not look beyond the four corners of the amended complaint. *See Speaker*, 623 F.3d at 1379. Thus, we conclude that the court's dismissal of those claims was not in error. And Team cites no authority holding that a district court must reconsider its dismissal of a plaintiff's claims and revive those claims following a grant of summary judgment, which is reviewed under a different standard than that of a motion to dismiss.

We now turn to Team's FDUTPA claim. FDUTPA "seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired *within the territorial boundaries of [Florida]* without

limitation." *Millennium Commc'ns & Fulfillment, Inc. v. Off. of Att'y Gen., Dep't of Legal Affs.*, 761 So. 2d 1256, 1262 (Fla. Dist. Ct. App. 2000) (emphasis added). Team, however, did not make any allegations in its amended complaint that SES engaged in any unfair, deceptive, or unconscionable practices that took place within Florida. Thus, the district court did not err in dismissing the FDUTPA claim or abuse its discretion in denying Team's motion for reconsideration as to the claim.

## IV.  CONCLUSION

For all these reasons, we affirm the district court's judgment.

**AFFIRMED.**